OPINION
{¶ 1} Plaintiff-appellant, Three-C Body Shops, Inc. ("Three-C"), appeals from a judgment of the Franklin County Court of Common Pleas granting the summary judgment motion of defendant-appellee, Welsh Ohio, LLC ("Welsh").
 {¶ 2} In late 1999, Three-C determined to relocate a subsidiary business known as Schmidt Collision to a location closer to Three-C's headquarters. In early 2000, Three-C's president Bob Juniper noticed a "For Lease" sign on a former Advance Auto Parts store located at 1516 Harrisburg Pike in Columbus, Ohio. Juniper mentioned the building to Three-C's Chief Operating Officer, Dennis Pappas, who contacted the phone number on the "For Lease" sign to inquire about the building. Pappas spoke to Ron Beitzel, a licensed real estate agent employed by defendant, Welsh. Welsh had been retained by Advance Auto Stores, Inc. ("Advance"), who held a long-term lease on the former auto parts store, to find a sub-tenant for the property. Beitzel and Laura Miller, a Welsh vice-president, were the agents responsible for the Advance property.
 {¶ 3} On March 11, 2000, Beitzel led Juniper and Pappas on a brief "walk through" of the property, at which time Juniper and Pappas determined that the property would meet Three-C's needs. Thereafter, Juniper, Pappas, and Beitzel discussed the terms under which Three-C would be willing to lease the property, including the fact that Three-C wanted to be able to occupy the building no later than May 1, 2000, and that Three-C's desire to lease the property was subject to being able to obtain a conditional use permit to operate a body shop on the property from the city of Columbus by May 1, 2000. Several days later, Beitzel and Miller faxed a letter to Juniper confirming Three-C's proposed terms for leasing the property. Included in this fax was an "Agency Disclosure Statement" informing Three-C that Welsh was acting as the real estate agent for Advance in attempting to obtain a tenant for the property.
 {¶ 4} On March 24, Beitzel met Juniper and Pappas at the property in order to allow the latter to take a more careful look at the property. During this second meeting at the property, Beitzel presented Juniper with a letter on Welsh letterhead that set forth the major terms of a counter-offer proposed by Advance. Like Three-C's initial offer, the proposal included a term which made any agreement contingent upon Three-C obtaining a conditional use permit for the property by May 1, 2000. The letter was signed by Beitzel and Miller, but was not signed by anyone from Advance. The letter also provided a signature line for Juniper in the event that Three-C agreed to the terms contained in the letter. Finally, the letter contained the following notation: "Advance Auto Parts requires that they use their corporate lease document to execute any lease transaction involving Advance controlled real estate." Juniper read the letter, showed it to Pappas, and then signed it and returned it to Beitzel. According to Juniper's deposition testimony, when he signed the proposal letter Beitzel stated that the lease documents would be forthcoming.
 {¶ 5} On March 29, 2000, Beitzel faxed Pappas an unexecuted copy of the sublease agreement. The draft agreement indicated that the agreement was a sublease and that the consent of the property owner would be required to complete the agreement. Three-C never received an executed copy of the lease documents.
 {¶ 6} Although the lease documents had not been signed, Juniper's deposition testimony indicates that Three-C spent much of the month of April 2000, modifying the property to make it suitable for the operation of Schmidt Collision. Included in the modifications made to the property by Three-C during this period were the installation of a ramp and a large overhead door to enable cars to get into the building. On May 1, Pappas notified Beitzel that the city of Columbus had determined that Three-C did not need a conditional use permit for the property. Several days later, Three-C formally relocated Schmidt Collision to the property.
 {¶ 7} On May 8, 2000, Advance notified Beitzel that it was going to have to obtain permission from the property owner, the Gabriel Family Limited Partnership ("GFLP"), in order to complete the deal. Beitzel then telephoned Pappas to inform him of the development with GFLP. According to Pappas, until Beitzel's telephone call, Three-C was unaware that Advance leased, rather than owned, the subject property. Following his conversation with Pappas, Beitzel contacted a representative for GFLP. During this conversation, Beitzel was informed that not only had GFLP not yet decided to approve Three-C's sublease of the property, but that GFLP was considering legal action against Advance for allowing Three-C to modify and occupy the property without GFLP's consent.
 {¶ 8} On June 15, 2000, Advance notified Welsh that it was outraged that Three-C had modified and occupied the property without a lease and instructed Welsh to have Three-C vacate the property by June 19, 2000. Beitzel and Miller then placed a conference call to Pappas in which they informed him that Three-C had no right to be in the building and that the locks would be changed on June 19, 2000. Shortly thereafter, Three-C was forced to vacate the premises and Schmidt Collision temporarily ceased operation. Eventually, Three-C reached an agreement with Advance and GFLP to sublet the property, at which time it had to move Schmidt Collision and all of its equipment back into the building. Three-C alleges, however, that, as a direct result of the need to temporarily cease operating Schmidt Collision and to move the company out of, and then back into, the property, Schmidt was forced to cease operating in November 2000.
 {¶ 9} On April 18, 2001, Three-C filed a complaint in the Franklin County Court of Common Pleas asserting claims for negligent misrepresentation, promissory estoppel, and breach of contract against Welsh, seeking damages arising out of the need to move Schmidt Collision out of, and then back into, the subject property, and the failure of the business. On January 16, Welsh moved for summary judgment on all counts of Three-C's complaint. On April 12, 2002, the trial court granted Welsh's motion for summary judgment. Three-C appeals from the trial court's decision assigning the following error:
 {¶ 10} "The trial judge committed reversible error by granting summary judgment in favor of defendant."
 {¶ 11} Preliminarily, because Three-C's assignment of error arises out of the trial court's ruling on a motion for summary judgment, we review the trial court's determination independently and without deference. Brown v. Scioto Cty. Bd. of Commrs. (1993), 87 Ohio App.3d 704,711. In conducting our review, we apply the same standard as the trial court, Maust v. Bank One Columbus, N.A. (1992), 83 Ohio App.3d 103, 107. In accordance with Civ.R. 56, summary judgment may only be granted if, viewing the evidence most strongly in favor of the non-moving party, no genuine issue of fact exists, the moving party is entitled to judgment as a matter of law, and reasonable minds can only come to a conclusion which is adverse to the non-moving party. Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64.
 {¶ 12} In moving for summary judgment, a party must inform the court of the basis of the motion and identify areas in the record that demonstrate the absence of a genuine issue of material fact. Dresher v. Burt (1996), 75 Ohio St.3d 280, 296. Once the moving party has made its initial showing, the non-moving party, in order to avoid summary judgment, must produce evidence on any issues identified by the moving party for which the non-moving party bears the burden of production at trial. Wing v. Anchor Media, Ltd. of Texas (1991), 59 Ohio St.3d 108, paragraph three of the syllabus (Celotex Corp. v. Catrett [1986],477 U.S. 317,106 S.Ct. 2548, approved and followed).
 {¶ 13} Three-C's lone assignment of error alleges that the trial court erred in granting summary judgment for Welsh on each of Three-C's three claims for relief. In addressing this contention, we will discuss Three-C's three claims for relief separately, beginning with its claim for breach of contract. The breach of contract claim set forth in Three-C's complaint alleges that Welsh entered into a contract with Three-C when Juniper signed the proposal letter from Welsh which set forth the terms of Advance's counter-offer. It is readily apparent that this claim must fail, as the record is devoid of any evidence of a contract between Welsh and Three-C. Although the proposal letter was drafted and signed by Beitzel and Miller, the letter is clear that the terms set forth therein are proposed by Advance and that Welsh is conveying the proposal as Advance's real estate agent.
 {¶ 14} In recognition of the fact that it cannot prevail on a breach of contract claim against Welsh, Three-C argues that its breach of contract claim is, in fact, a claim for breach of an implied warranty of authority to contract. Essentially, Three-C contends that Beitzel led it to believe that Welsh was authorized to contract on behalf of Advance, when, in fact, Welsh had no such authority. Under Ohio law, a person who contracts as agent for another without having the actual authority to contract on behalf of the other, is personally liable to those who, in ignorance of the agent's want of authority, contract with him. Farmers' Co-Op. Trust Co. v. Floyd (1890), 47 Ohio St. 525, paragraph one of the syllabus; Walton v. Hudson (1947), 82 Ohio App. 330, 331.
 {¶ 15} Initially, Welsh is entitled to judgment on Three-C's claim for breach of an implied warranty of authority to contract because Three-C failed to properly plead the claim. Pursuant to Civ.R. 8(A) and (E), a claim need only briefly set forth operative facts sufficient to give the opposing party fair notice of the nature of the claim. DeVore v. Mutual of Omaha Ins. Co. (1972), 32 Ohio App.2d 36, 38. In the present case, however, Three-C's complaint contains nothing to indicate that it is intended to state a claim for breach of warranty. Rather, the complaint plainly and concisely sets forth claims for negligent misrepresentation, promissory estoppel and breach of contract, and contains no mention of any alleged breach of warranty.
 {¶ 16} Three-C's claim for breach of an implied warranty of authority to contract also fails because the record is devoid of any evidence to support Three-C's claim that it had reason to believe that Welsh was authorized to contract on Advance's behalf. Instead, the evidence shows that Welsh disclosed its capacity as Advance's real estate agent in a fax sent to Three-C on March 14, 2000. Given this disclosure and the lack of any evidence suggesting that Welsh possessed authority greater than that ordinarily possessed by a real estate agent,[1]
Three-C could not reasonably have believed that Welsh was authorized to contract on behalf of Advance.
 {¶ 17} Given the foregoing discussion, the trial court properly granted Welsh summary judgment on Three-C's claim for breach of contract or breach of an implied warranty of authority to contract.
 {¶ 18} We now turn to Three-C's claim for negligent misrepresentation. Initially, Welsh contends that Three-C cannot prevail on its claim for negligent misrepresentation because it was not in privity of contract with Three-C. In support of this claim, Three-C relies on the case of Floor Craft Floor Covering, Inc. v. Parma Community Gen. Hosp. Assn. (1990), 54 Ohio St.3d 1, in which the Ohio Supreme Court held: "In the absence of privity of contract between two disputing parties the general rule is `there is no * * * duty to exercise reasonable care to avoid intangible economic loss or losses to others that do not arise from tangible physical harm to persons and tangible things.' " Id. at 3 (quoting Prosser Keeton, Law of Torts [5 Ed. 1984] 657, Section 92). Welsh's reliance on Floor Craft is misplaced, as the holding therein has been limited to situations in which the parties had no direct interaction with one another. Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth. (1993), 88 Ohio App.3d 73, 76; Schoedinger v. Hess (June 8, 2000), Franklin App. No. 99AP-1254. Three-C and Welsh had extensive, direct interaction pertaining to Three-C's desire to lease the property listed by Welsh. Accordingly, the lack of privity between Welsh and Three-C does not bar Three-C's claim for negligent representation against Welsh.
 {¶ 19} In order to prevail on a claim of negligent misrepresentation, a plaintiff must establish that: (1) the defendant, as a result of his failure to exercise due care or competence, supplied false information for the guidance of the plaintiff in a transaction in which the defendant had a pecuniary interest; and (2) that the plaintiff justifiably relied upon the false information supplied by the defendant and suffered damages as the proximate result of such reliance. Delman v. Cleveland Hts. (1989), 41 Ohio St.3d 1, 4. In the present case, Three-C alleges that Welsh, acting through Beitzel, assured Three-C that Juniper's signing of the proposal letter during the second "walk through" on March 24, 2000, completed the deal allowing Three-C to occupy the building by May 1, 2000.
 {¶ 20} Specifically, Pappas testified at his deposition that, after Juniper signed the letter from Welsh containing the terms of Advance's counter-proposal, Beitzel indicated that he considered the deal to be done. Pappas further testified that, on several occasions thereafter, when he telephoned Beitzel to inquire about why he had not yet received the final, executed lease documents from Advance, Beitzel assured him that the deal was done and that the delay in getting the lease documents should not concern him. Beitzel, as Advance's real estate agent, was in a position to know that Advance had not executed the actual lease documents. This evidence is sufficient to create a genuine issue of material fact regarding whether Beitzel negligently provided Three-C with false information about the status of the deal. However, the question remains as to whether Three-C could have justifiably relied on Beitzel's misrepresentations.
 {¶ 21} Establishing justifiable reliance does not require a showing that the party's reliance conformed to what a "reasonable man" would have believed. Amerifirst Savings Bank of Xenia v. Krug (1999),136 Ohio App.3d 468, 496. Rather, the question of whether justifiable reliance exists involves a fact-based inquiry into the circumstances of the case and the relationship between the parties. Lepera v. Fuson (1992), 83 Ohio App.3d 17, 26. "Reliance is justified if the representation does not appear unreasonable on its face and if, under the circumstances, there is no apparent reason to doubt the veracity of the representation." Crown Property Development, Inc. v. Omega Oil Co. (1996), 113 Ohio App.3d 647, 657. Applying this standard to the circumstances and relationships in the present case, we can only conclude that Three-C was not justified in relying on Beitzel's oral assurances that the deal was done.
 {¶ 22} The evidence in the record shows that Welsh plainly informed Three-C that its role was that of Advance's real estate agent. Further, there is no evidence that Welsh ever represented that its authority was greater than that of a real estate agent. In addition, the proposal letter which Three-C executed prior to Welsh's alleged misrepresentations was not executed by anyone from Advance and plainly indicated that Advance would require the actual lease to be executed on its corporate lease documents. Finally, Three-C concedes that Pappas had over 30 years of experience with commercial leases. It simply is not reasonable for Three-C, acting through a chief operating officer with more than thirty-years of commercial leasing experience, to rely on the assurances of Advance's real estate agent that a lease had been consummated, when Three-C was fully aware that Welsh was acting solely as Advance's real estate agent, that Advance had never executed any lease documents, and that Advance required the actual lease to be executed on its corporate forms.
 {¶ 23} In arguing that the record does create a genuine issue of fact on issue of justifiable reliance, Three-C points to Pappas' testimony that, in his experience, it was not unusual for leases to be created out of a series of documents and that a deal could be considered done when the realtor's sign came down, and that, in the present case, Welsh's sign came down shortly after Three-C executed the proposal letter. Unquestionably, it is possible for a valid lease to arise from an exchange of several documents. However, the present case does not present such an exchange of forms scenario, as Advance never executed even one lease document, much less several. Finally, given the fact that Advance had never executed a lease document, Three-C was no more justified in relying on Welsh's removal of its sign from the property as evidence of a completed deal than it was in relying upon Welsh's express claims that the deal was done.
 {¶ 24} Because Three-C failed to present evidence sufficient to create a genuine issue of material fact on the element of justifiable reliance, the trial court properly granted summary judgment to Welsh on Three-C's claim for negligent misrepresentation.
 {¶ 25} Three-C's final claim against Welsh is for promissory estoppel. The doctrine of promissory estoppel holds as follows:
 {¶ 26} " `A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.' " McCroskey v. State (1983), 8 Ohio St.3d 29, 30 (quoting Restatement of the Law, Contracts 2d [1973], Section 90).
 {¶ 27} Three-C contends that the proposal letter containing the terms of Advance's counter-offer constituted a promise by Welsh of the terms contained therein. The flaw in Three-C's argument is that the proposal letter is very clear that the terms set forth in the letter are proposed by Advance and not by Welsh. Welsh cannot be bound by the terms of the proposal simply because it drafted the letter conveying Advance's proposal. Faced with this reality, Three-C argues that Welsh can be bound by the promise in the letter because it misled Three-C to believe that it was authorized to contract on behalf of Advance. This argument amounts to nothing more than a repackaged version of Three-C's claim for breach of an implied warranty of authority to contract. As we have previously discussed, the record is devoid of any evidence from which a jury could find that Welsh caused Three-C to believe that it was acting as anything more than a real estate agent for Advance. Accordingly, the trial court properly granted summary judgment for Welsh on Three-C's promissory estoppel claim.
 {¶ 28} Three-C's lone assignment of error is overruled and the judgment of the trial court is affirmed.
Judgment affirmed.
BOWMAN and BRYANT, JJ., concur.
McCORMAC, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] The trial court concluded that Three-C's claim for breach of an implied warranty of authority to contract failed because the evidence established that Welsh was, in fact, authorized to contract on behalf of Advance. The trial court based this conclusion on a letter written to Beitzel and Miller by counsel for Advance on June 15, 2000, after Advance learned that Three-C was occupying the property without a lease. We are at a loss to understand the trial court's reading of the letter in question. Nothing in the letter supports a finding that Welsh was anything more than Advance's real estate agent. In fact, the only reference to Welsh's authority in the letter is the comment that Welsh was retained by Advance to find a sub-lessee for the subject property.