**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0357n.06

No. 08-3857

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
**May 20, 2009**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| COMMERCE BENEFITS GROUP, INC. | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | C O U R T  F O R  T H E |
| v. | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| MCKESSON CORPORATION; PER-SE | ) | |
| TECHNOLOGIES, INC., | ) | **O P I N I O N** |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE:     CLAY and McKEAGUE, Circuit Judges;  and HOLSCHUH, District Judge.[*]

**McKEAGUE, Circuit Judge.**  This diversity case involves a business relationship gone sour.  In September 2006, employees of Commerce Benefits Group ("CBG") and Per-Se Technologies, Inc. ("Per-Se") met and discussed the possibility of jointly marketing and promoting services to hospitals relating to a federal prescription drug pricing program.  They left the meeting optimistic about the business initiative, and they began making sales calls together.  But the relationship became strained soon after McKesson Corporation ("McKesson") acquired Per-Se in early 2007.  Although CBG sought to formalize the relationship, McKesson continued to delay and directed CBG not to make any sales calls on its behalf until a formal agreement was reached.

---

[*]The Honorable John D. Holschuh, United States District Judge for the Southern District of Ohio, sitting by designation.

Eventually, CBG sued McKesson in Ohio state court, alleging breach of contract, promissory estoppel, and other state law claims. McKesson removed the case to federal district court in Ohio. After permitting CBG to add Per-Se as a party defendant, the district court granted summary judgment to McKesson and Per-Se (collectively, "defendants") on all claims. On appeal, CBG argues that the district court improperly granted summary judgment to defendants on its promissory estoppel claim and erred in several procedural rulings. We **AFFIRM**.

**I**

**A. Factual Background**

McKesson is a large corporate distributor of prescription drugs. Per-Se manages revenue cycles and other pharmaceutical program services in the health care industry. CBG is a third-party administrator that manages employer benefit plans. CBG provided health plan administration services to Per-Se until McKesson acquired Per-Se in January 2007.

In September 2006, the Chief Executive Officer of Per-Se, Phil Pead, and the Chief Executive Officer of CBG, Tom Patton, set up a meeting at CBG's corporate headquarters in Avon Lake, Ohio, to discuss possible business initiatives and opportunities for the two companies (the "Avon Lake meeting").[1] Patton represented CBG at the meeting, while Phil Jordan, the Chief Product Officer of Per-Se, led the contingent of Per-Se employees.

One of the initiatives the parties discussed at the Avon Lake meeting involved the so-called "340B program," a federal prescription drug pricing program that enables certain health care systems

---

[1]CBG videotaped this meeting and had it transcribed.

that serve a disproportionately large number of indigent patients ("Disproportionate Share Hospitals" or "DSH Facilities") to obtain prescription drugs at deeply discounted prices. *See* Veteran's Health Care Act of 1992, Pub. L. No. 102-585, § 603, 106 Stat. 4944, 4967-73 (1992) (codified at 42 U.S.C. § 256b). Patton discussed his idea for marketing a 340B inventory management program to hospital system clients (the "340B initiative"). Specifically, Patton proposed that CBG would counsel hospitals on ways to use health care plans that would drive their own employees back into the hospital for prescription drug treatment, which would generate more 340B-eligible prescriptions. Per-Se would use its technology and service offerings to handle inventory management and otherwise provide 340B support. By expanding the number of doctors and patients eligible to participate in the 340B program, the idea was that hospitals would realize a significant savings and would pay CBG and Per-Se a portion of that savings as a fee.

The parties discussed but did not reach an agreement as to the income split for the 340B initiative. They left the Avon Lake meeting, however, with an understanding that they would "cooperatively sell the first few deals." CBG would use its affiliated brokers to gain an audience with hospitals. After a successful sales call, the parties would attempt to secure a contract.

Throughout the next several months, Patton, often accompanied by Per-Se employees Skip Best or Holly Russo, made approximately twelve to fifteen sales calls to various hospitals to promote the 340B initiative. Best testified that only two of these meetings resulted in a "term sheet," or drafted contract, being presented to the client. Neither of these clients, however, ever signed a contract for the 340B program. During this time, Patton worked and communicated almost

exclusively with Best, who was the Vice President of Pharmacy Solutions at Per-Se. Best reported to Scott Bagwell, Executive Vice President of Sales and Marketing of Pharmacy Solutions at Per-Se.

After McKesson acquired Per-Se in January 2007, Best discovered that his position at Per-Se was being eliminated. Before he left at the end of April, Best attempted on several occasions to convince his superiors to formalize Per-Se's relationship with CBG. Scott Bagwell responded hopefully, but expressed reservations about the 340B initiative, writing, in an email to Best, that "there are many disconnected dots in the scenario [ ] you're describing." R.O.A. at 244.

At the same time, Patton was becoming increasingly concerned about CBG's lack of a formal contract with Per-Se. In an email to Best in mid-January 2007, Patton noted that he had "yet to find anything that was cut-in-stone." R.O.A. at 201. Patton indicated that he "had no concern about getting fairly compensated by Per-Se" but "with McKesson now entering the picture," he wanted a "formalized contract." *Id.* In a letter to Scott MacKenzie, President of Pharmacy Solutions at Per-Se, in mid-February 2007, Patton wrote that "we need to structure a financial compensation program that allow [sic] for CBG and my broker network to keep the leads and development moving forward." R.O.A. at 214. During a recorded telephone conversation with Scott Bagwell in early April 2007, who had since become the Senior Vice President of Sales and Marketing at McKesson, Patton stated that there was "no formal structure. That is what we are trying to work around. Skip kept telling me I have a sample contract, but it is not ready to show you." R.O.A. at 196. Bagwell informed Patton that a tentative contract was being drafted.

By the end of April, however, Bagwell emailed Patton and informed him that "the distribution contract with CBG will be delayed several months" as a result of the McKesson

acquisition. R.O.A. at 228. Bagwell made clear in a subsequent email that "until we have a contract in place with CBG," Per-Se was "not authorizing any sales calls on McKesson's Easy340b solution." R.O.A. at 226. In the meantime, CBG apparently continued to go on sales calls and to correspond with hospitals about the 340B initiative. In early May, Bagwell sent another email "ask[ing] CBG again to stop implying that there is a formal relationship to any customer between CBG and McKesson." R.O.A. at 184.

## B. Procedural History

On May 18, 2007, apparently believing that no formal contract would come to fruition, CBG sued McKesson in the Lorain County Court of Common Pleas, alleging breach of contract, promissory estoppel, and breach of the implied covenant of good faith and fair dealing. McKesson timely removed the suit to the United States District Court for the Northern District of Ohio based upon diversity jurisdiction.

On September 20, 2007, CBG filed a second amended complaint with the federal district court, alleging breach of contract, promissory estoppel, and unjust enrichment. On December 28, 2007, CBG filed a motion for leave to file a third amended complaint seeking to add a claim for breach of fiduciary duty against McKesson. A few days later, on December 31, 2007, CBG filed a motion to compel proper responses by McKesson to its document requests, which was referred to a magistrate judge.

On January 2, 2008, McKesson filed a motion for summary judgment. CBG opposed the motion on January 16, 2008. On the same day, CBG filed a motion for leave to file a fourth amended complaint, this time seeking to add Per-Se as a new party defendant and to add a breach

of fiduciary duty claim against Per-Se. CBG also sought to add a claim for tortious interference with business relationships against McKesson. On January 28, 2008, the district court granted in part and denied in part CBG's motions for leave to amend. Specifically, it granted CBG leave to file a third amended complaint adding Per-Se as a party defendant, but it did not permit CBG to add new claims against McKesson or Per-Se beyond those already included in the second amended complaint.

After being added as a defendant, Per-Se filed its own motion for summary judgment, which CBG opposed. CBG also requested additional time to fully respond to both summary judgment motions pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. It argued that, as stated in its motion to compel, McKesson and Per-Se had failed to undertake a reasonable search for electronic documents that had been requested by CBG. On March 6, 2008, however, a magistrate judge denied CBG's motion to compel. Accordingly, the district court denied CBG's motion for more time to respond and granted summary judgment to McKesson and Per-Se on all claims. CBG filed a motion for reconsideration pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, which the district court also denied. This timely appeal followed.

**II**

On appeal, CBG makes three arguments. First, it argues that defendants were not entitled to summary judgment on the promissory estoppel claim. Second, it argues that the district court improperly denied in part its motions to amend the complaint. Finally, CBG argues that the district court made several errors in its case management and discovery-related rulings.

**A. Promissory Estoppel**

CBG first argues that the district court erred in granting summary judgment to McKesson on its promissory estoppel claim.[2] We review a district court's grant of summary judgment *de novo*. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). To survive a motion for summary judgment, the nonmoving party must provide evidence beyond the pleadings "set[ting] out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(c). The district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007).

In Ohio, "[p]romissory estoppel is a quasi-contractual concept where a court in equity seeks to prevent injustice by effectively creating a contract where none existed." *Telxon Corp. v. Smart Media of Del., Inc.*, Nos. 22098, 22099, 2005 WL 2292800, at *21 (Ohio Ct. App. Sept. 21, 2005). Under Ohio law, "'[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'" *McCroskey v. State*, 456 N.E.2d 1204, 1205 (Ohio 1983) (adopting RESTATEMENT (SECOND) OF CONTRACTS § 90 (1973)); *see also Shampton v. Springboro*, 786 N.E.2d 883, 887 (Ohio 2003); *Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 303-04 (6th Cir. 2008).

---

[2]CBG does not challenge the district court's grant of summary judgment to defendants on the breach of contract and unjust enrichment claims.

To establish a claim of promissory estoppel under Ohio law, the plaintiff must prove the following elements: (1) a clear and unambiguous promise; (2) reliance upon the promise by the promisee; (3) reliance by the promisee that is both reasonable and foreseeable; and (4) injury to the promisee as a result of the reliance. *Rigby v. Fallsway Equip. Co., Inc.*, 779 N.E.2d 1056, 1061 (Ohio Ct. App. 2002); *Cohen & Co., CPAs v. Messina, CPA*, 492 N.E.2d 867, 872 (Ohio Ct. App. 1985); *see also Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 503 (6th Cir. 2003). The party asserting the claim—in this case, CBG—bears the burden of proving these elements by clear and convincing evidence. *Dailey v. Craigmyle & Son Farms, L.L.C.*, 894 N.E.2d 1301, 1307 (Ohio Ct. App. 2008).

Here, the district court concluded that CBG failed to show a clear and unambiguous promise on the part of defendants, and we agree. A promise is "'a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." *Id.* (quoting *Stull v. Combustion Eng'g, Inc.*, 595 N.E.2d 504, 507 (Ohio Ct. App. 1991)). It is a promise that "a promisor would expect to induce reliance" on the part of the promisee. *Casilla v. Stinchcomb*, No. E-04-041, 2005 WL 1845318, at *3 (Ohio Ct. App. July 8, 2005). This element "is not satisfied by vague or ambiguous references." *Id.*

According to the transcript of the Avon Lake meeting, defendants reacted positively to Patton's proposed 340B initiative but were careful not to make any promises. The parties understood that they "want[ed] to cooperatively sell the first few deals." Sept. Mtg. Tr. at 10, R.O.A. at 138. But Scott MacKenzie stated that, "Now, I want to make sure we aren't over-representing—there is still some work here . . . ." Sept. Mtg. Tr. at 6, R.O.A. at 135. And indeed, the parties had much to

work through: they never came to any conclusion regarding the revenue split between them, Patton Dep. 44, R.O.A. at 734 ("[T]here was no dollar amount set, absolutely not, at that meeting . . . ."), the duration of the business relationship, or the specific process by which they would jointly market the 340B initiative. Tom Patton even admitted that after the meeting, "we had no big picture deal done." Patton Dep. 45, R.O.A. at 735. Based upon this record, it is evident that the Avon Lake meeting did not result in a clear, unambiguous promise on the part of defendants.

There is also no evidence of any unambiguous promise made to CBG in the months following the Avon Lake meeting. Although the parties discussed the planned revenue split, it was by no means certain. According to Patton, he had "yet to find anything that was cut-in-stone." R.O.A. at 201. He also urged Scott MacKenzie that "we need to structure a financial compensation program that allow [sic] for CBG and my broker network to keep the leads and development moving forward." R.O.A. at 214. In March 2007, Patton sent MacKenzie an email requesting that the parties meet "to finalize the Contract and Compensation issues." R.O.A. at 303. Further, the record indicates that the relationship between CBG and Per-Se after the Avon Lake meeting was still only tentative. When asked whether "anybody with any of the McKesson companies ever unconditionally represented to you that, no matter what, this is going to happen, we're going forward," Patton responded, "No, and I never asked anybody." Patton Dep. 120, R.O.A. at 810.

Given the evidence in the record, CBG has failed to set forth a genuine issue of material fact as to whether defendants clearly and unambiguously promised to jointly participate in the 340B initiative. If any promises were made at all, they were too vague and ambiguous to satisfy the first

element of a promissory estoppel claim.[3] Accordingly, the district court properly granted summary judgment to McKesson and Per-Se on the promissory estoppel claim.

**B. Motions for Leave to Amend Complaint**

In its second claim of error, CBG argues that the district court improperly denied in part its motions for leave to file an amended complaint to assert a breach of fiduciary duty claim against Per-Se and McKesson and a tortious interference claim against McKesson. We review a district court's denial of a motion for leave to amend for abuse of discretion, except to the extent that it is based upon a legal determination that the amendment would not survive a motion to dismiss. *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 346 (6th Cir. 2007); *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792, 805 (6th Cir. 2005). "'Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment.'" *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 554 (6th Cir. 2008) (quoting *Tahfs v. Proctor*, 316 F.3d 584, 593 (6th Cir. 2003)).

Generally, a party may amend its pleading once as a matter of course, but in all other cases it may amend a pleading only with the opposing party's consent or with leave of the court. FED. R. CIV. P. 15(a). "The court should freely give leave when justice so requires." *Id.* Once the scheduling order's deadline to amend the complaint passes, however, "a plaintiff first must show

---

[3]At best, there was a promise by defendants to jointly explore the 340B initiative and to "cooperatively sell the first few deals." Even if this is sufficient to constitute a clear and unambiguous promise, however, CBG still cannot recover: the parties, in fact, *did* jointly market the first few deals, going on twelve to fifteen sales calls together, and none of these sales calls resulted in a contract with any of the hospital clients. Further, although CBG argues that McKesson is now offering a 340B plan that is similar to the one proposed by CBG, that is irrelevant if CBG cannot show that defendants clearly promised to jointly participate in the 340B initiative with CBG.

good cause under Rule 16(b) [of the Federal Rules of Civil Procedure] for failure earlier to seek leave to amend" and the district court must evaluate prejudice to the nonmoving party "before a court will [even] consider whether amendment is proper under Rule 15(a)."[4] *Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003).

Here, the district court pointed out that "all parties should have been joined and pleadings amended nearly four months ago," that "[t]he case has already progressed past the dispositive discovery deadline and the original filing deadline for dispositive motions," and that McKesson had already moved for summary judgment. *Commerce Benefits Group, Inc.*, No. 1:07-CV-2036, 2008 WL 239550, at *3 (N.D. Ohio Jan. 28, 2008). Thus, because CBG could not adequately explain its delay in bringing the claims—indeed, the factual basis for the new claims existed at the beginning of the lawsuit—and because the addition of new tort claims would have resulted in prejudice to defendants at such a late stage in the litigation, the district court did not abuse its discretion in denying CBG's motions to amend.[5] *See Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) (upholding district court's denial of leave to amend because plaintiff was aware of basis of

---

[4]Rule 16(b)(4) provides that a scheduling order "may be modified only for good cause and with the judge's consent."

[5]CBG correctly points out that the district court did not specifically explain its reasons for denying the motion to amend with respect to the tortious interference claim against McKesson. Although denial of leave to amend without explanation is generally an abuse of discretion, *see Foman v. Davis*, 371 U.S. 178, 182 (1962), failure to provide an explanation is not *per se* an abuse of discretion if the reasons for denial are readily apparent. *See, e.g.*, *Miller v. Admin. Office of Courts*, 448 F.3d 887, 898 (6th Cir. 2006); *Troxel Mfg. Co. v. Schwinn Bicycle Co.*, 489 F.2d 968, 971 (6th Cir. 1973); *Ohio Midland, Inc. v. Ohio Dep't of Transp.*, 286 F. App'x 905, 910 (6th Cir. 2008). Here, it is apparent that the same reasons for the district court's denial of CBG's request to add the fiduciary duty claim against Per-Se and McKesson applied in the context of its request to add the tortious interference claim against McKesson.

claim for months prior to seeking amendment, the time for discovery had passed, dispositive motion deadline had passed, and a motion for summary judgment had been filed); *Leary*, 349 F.3d at 909 (holding that district court did not abuse its discretion where it determined that plaintiffs failed to show good cause to amend complaint after dispositive motion deadline).

## C. Discovery-Related Rulings

Finally, CBG challenges several of the district court's case management and discovery-related rulings. It first argues that the magistrate judge improperly denied CBG's motion to compel. But unless a magistrate judge is given plenary jurisdiction over a case pursuant to 28 U.S.C. § 636(c)(1), we are "'without jurisdiction to review the magistrate's order unless the parties have sought review in the district court.'"[6] *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 472 (6th Cir. 2006) (quoting *Ambrose v. Welch*, 729 F.2d 1084, 1085 (6th Cir. 1984) (per curiam)); *see also Moon v. Harrison Piping Supply*, 465 F.3d 719, 725 (6th Cir. 2006). Here, the district court referred CBG's motion to compel to the magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A), which permits a district court to "designate a magistrate judge to hear and determine any pretrial matter pending before the court." The magistrate judge did not have plenary jurisdiction under § 636(c)(1). Because CBG did not seek review of the magistrate judge's order on its motion to compel in the district court, then, we lack jurisdiction to review the denial of the motion to compel.

---

[6]Section 636(c)(1) provides, in pertinent part: "Upon consent of the parties, a . . . magistrate judge . . . may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court or courts he serves."

CBG next argues that the district court abused its discretion when it denied CBG's request for an extension of time to conduct discovery before ruling on defendants' motions for summary judgment. Under Rule 56(f) of the Rules of Civil Procedure, a party opposing a motion for summary judgment may request additional discovery if "it cannot present facts essential to justify its opposition." FED. R. CIV. P. 56(f). We review a district court's decision on such a request for an abuse of discretion. *Ball v. Union Carbide Corp.*, 385 F.3d 713, 720 (6th Cir. 2004). Here, CBG sought additional time for discovery under Rule 56(f) based upon its pending motion to compel, in which it argued that defendants had failed to produce requested documents. As noted above, however, the magistrate judge ultimately denied CBG's motion to compel, eliminating the entire basis for CBG's Rule 56(f) request. The district court therefore committed no abuse of discretion in denying CBG's Rule 56(f) request and proceeding to grant summary judgment to defendants.

Finally, CBG contends that the district court improperly denied its motion to enlarge the time for discovery. We review a district court's decision to amend its scheduling order for abuse of discretion. *Andretti v. Borla Performance Indus., Inc.*, 426 F.3d 824, 830 (6th Cir. 2005). "A scheduling order may be modified only for good cause and with the judge's consent." FED. R. CIV. P. 16(b)(4). "'The primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements.'" *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002) (quoting *Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir. 2001)). "Another relevant consideration is possible prejudice to the party opposing the modification." *Id.*; *see also Leary*, 349 F.3d at 909. Here, the district court correctly concluded that CBG did not establish good cause for an extension of the discovery period. CBG had already been

given seven months in which to conduct discovery. It also had almost two months to complete discovery, including any additional discovery it sought from the newly-added defendant, Per-Se. Moreover, any further delay in discovery would have resulted in additional time and expense incurred by both the parties and the court and would have unfairly prejudiced defendants. The district court therefore did not abuse its discretion in denying CBG's request for additional discovery time.

## III

For the foregoing reasons, we **AFFIRM** the decisions of the district court.